*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMES MICHAEL KENNY,

        Defendant-Appellant.

UNPUBLISHED
April 16, 2019

No. 342242
Clinton Circuit Court
LC No. 2015-009485-FH

Before: BORRELLO, P.J., and SHAPIRO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals his jury trial convictions of aggravated stalking, MCL 750.411i, felonious assault, MCL 750.82, and resisting or obstructing a police officer, MCL 750.81d(1). He was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve 12 to 35 years in prison for the aggravated stalking conviction and 10 to 15 years in prison for the felonious assault and resisting or obstructing convictions, to be served concurrently. We affirm.

## I. BACKGROUND

This case arose out of defendant's obsession with Michelle Monroe, a corrections officer who worked at a prison where defendant was once incarcerated. Monroe testified that defendant "at times taunted" her and made inappropriate comments during his incarceration. He also sent a letter to a prison inspector in which he claimed that he and Monroe had engaged in sexual conduct. Monroe testified that this was false and that the prison had investigated this accusation and found it unsubstantiated. Defendant was transferred to a different prison because of his conduct towards Monroe. Once defendant was released from prison, he tried to contact Monroe by sending her letters and calling the prison where she worked. Monroe obtained a personal protection order (PPO) against defendant after defendant sent a letter about Monroe to her father.

A few months after the PPO was issued, defendant appeared at Monroe's home. Monroe's fiancé, Michael Bartman, testified that he answered a knock on the door while Monroe was at work. Although Bartman did not immediately recognize defendant, he quickly realized

-1-

that was the man who "was pretty much stalking" Monroe based on photos Monroe had shown him. Bartman testified, "I was going to grab him and I guess do a citizen's arrest . . . [b]ecause [defendant] had a PPO on him and he's on my doorstep." Bartman lunged at defendant, and defendant "pulled back [and] pulled a knife out." Bartman described the knife as a "standard dinner knife," but at the time he "wasn't worried what kind of knife it was" because he thought he was "going to die." Bartman knocked the knife out of defendant's hands and then "started swinging at him, and he was swinging back." Bartman chased defendant down the driveway but when he could not keep up with him, he went back into the house and called 911.

A number of officers responded to the scene and Bartman testified that there "was a manhunt" to find defendant for approximately 30 to 45 minutes. Sergeant Chris Crawford of the Clinton County Sheriff's Department testified that while he was searching, he saw defendant approximately 20 to 30 yards away in a "wooded area along a creek." He identified himself as a police officer and told defendant to stop, but defendant "took off running." Portland police officer Star Thomas eventually arrested defendant, and Deputy Zachary Smith of the Clinton County Sheriff's Office brought defendant back to Bartman and Monroe's house so they could identify him. Monroe and Bartman both testified that when they saw defendant, he vowed to kill them.

Several months after trial and sentencing, defendant filed a motion for directed verdict of acquittal because there was insufficient evidence to support the convictions. The trial court did not immediately issue a ruling on the motion. We granted in part defendant's complaint for superintending control and directed the trial court to enter an order disposing of the motion for directed verdict.[1] The trial court subsequently entered an order denying the motion. This appeal followed.

## II. JUDICIAL BIAS

Defendant argues that the trial court committed judicial misconduct when it advised the prosecutor to obtain a proof of service of the PPO. We disagree.[2]

A criminal defendant has a constitutional right to a fair trial. *People v Aceval*, 282 Mich App 379, 391; 764 NW2d 285 (2009). "A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality." *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015). This occurs "when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. Judicial misconduct includes "providing improper strategic advice to a particular side . . . ." *Id*. at 172-173. "A defendant

---

[1] *In re Kenny*, unpublished order of the Court of Appeals, issued December 8, 2017 (Docket No. 338573).

[2] Whether judicial misconduct deprived defendant of a fair trial is a question of constitutional law that is reviewed de novo. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

claiming judicial bias must overcome a heavy presumption of judicial impartiality." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (quotation marks and citation omitted).

After the first day of trial, the trial court discussed with the parties the need to show that defendant had actual notice of the PPO:

> . . . I'm assuming probably that somebody has the Ionia County file to show actual notice on the part of the Defendant of the fact that the restraining order was issued, because strangely enough even though the personal protection order law says you don't have to have actual notice to be bound, the statute dealing with stalking as a criminal offense says if it's a restraining order instead of an injunction, you do have to have notice, actual notice. So whether or not somebody's going to bring the file over, whether or not it contains a proof of service, other things, that's, you know, not my case to try but I'm assuming somebody can check with Ionia if they want regarding the status of that file.

The next day, Ionia County Deputy Clerk Shirley Austin testified that a deputy served defendant with Monroe's PPO against him and provided defendant actual notice of the PPO on January 27, 2015. The return of service was admitted into evidence.

Critically, the trial court's statement was made outside the presence of the jury. Therefore, there is no risk that the trial court's comment improperly influenced the jury by creating the appearance of advocacy or partiality against a party. See *Stevens*, 498 Mich at 164. Nor did the trial court overstep its authority and assume the role of an advocate. A trial court may exercise reasonable control over the presentation of the evidence to "make the . . . presentation effective for the ascertainment of the truth . . . ." MRE 611(a). Monroe testified that defendant received notice of the PPO because she "had him served." It is unclear whether Monroe's testimony, in the absence of a sustained objection, would have sufficed to prove actual notice. In any event, the trial court shared with the parties its view of what evidence was required to make that showing. We decline to hold that the trial court committed misconduct by stating the evidence necessary to prove aggravated stalking.

Alternatively, to the extent that the court's isolated statement was improper, defendant cannot overcome the heavy presumption of judicial impartiality. This limited instance of alleged judicial bias,[3] outside the presence of the jury, is insufficient to create an appearance of judicial partiality and could not possibly have improperly influenced the jury. See *People v Willis*, 322 Mich App 579, 588; 914 NW2d 384 (2018) ("A single instance of misconduct generally does not create an appearance that the trial judge is biased, unless the instance is so egregious that it pierces the veil of impartiality.").

---

[3] Defendant makes additional allegations of judicial bias in his reply brief. However, "[r]eply briefs must be confined to rebuttal, and a party may not raise new or additional arguments in its reply brief." *Kinder Morgan Mich, LLC v City of Jackson*, 277 Mich App 159, 193-194; 744 NW2d 184 (2007).

## III.  SUFFICIENCY OF THE EVIDENCE

Defendant asserts that there is insufficient evidence to support each of his convictions and that the trial court erred by denying his motion for a directed verdict of acquittal.  We disagree.[4]

## A.  AGGRAVATED STALKING

Aggravated stalking consists of the crime of stalking coupled with an aggravated circumstance specified in MCL 750.411i(2).  *People v Threatt*, 254 Mich App 504, 505; 657 NW2d 819 (2002).  Stalking is

> a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.  [MCL 750.411i(1)(e).]

Stalking becomes aggravated stalking when, among other possible scenarios, "the actions constituting the [stalking] offense are in violation of a restraining order and the individual has received actual notice of that restraining order . . . ."  MCL 750.411i(2)(a).

Defendant claims there was insufficient evidence to elevate his conduct to the crime of aggravated stalking because the prosecution failed to prove that he had actual notice of Monroe's PPO against him.  In particular, he argues that the prosecutor did not prove that he knew where Monroe lived.  He maintains that he was unaware of Monroe's current address, the implication being that he arrived at her residence on the day in question by happenstance.

Defendant's claim is without merit because none of his argument undermine the validity of the proof of service that the prosecutor admitted into evidence.  The proof of service stated that at on January 27, 2015, a deputy personally served a copy of the PPO on defendant at an address.  Further, the document was self-authenticating under MRE 902.  Accordingly, the prosecution established that defendant received actual notice of the PPO.

The prosecution also proved through circumstantial evidence that defendant knew where Monroe lived and arrived at her residence willfully.  See *People v Lee*, 243 Mich App 163, 167-168; 622 NW2d 163 (2000) ("[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.").  The evidence

---

[4] We review de novo challenges to the sufficiency of the evidence.  *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014).  We view the evidence "in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt."  *Id*.  We also review de novo a trial court's decision on a motion for a directed verdict.  *People v Aldrich,* 246 Mich App 101, 122; 631 NW2d 67 (2001).

established that defendant had an unhealthy obsession with Monroe which led her to obtain a PPO. Defendant subsequently arrived at her home and knocked on the door. When the police arrested defendant, he was carrying a black, serrated folding pocketknife and a disposable camera. The film was developed and contained photographs depicting Monroe's property. It is irrelevant that the PPO did not contain Monroe's address because the prosecution was not required to prove *how* defendant learned where she lived. Instead, it was only required to prove beyond a reasonable doubt that defendant acted willfully. Viewing the evidence in a light most favorable to defendant, the prosecution satisfied that burden.

## B. FELONIOUS ASSAULT

"The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). MCL 750.82(1) provides that a dangerous weapon includes "a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon . . . ." M Crim JI 17.10 defines a dangerous weapon "as any object that is used in a way that is likely to cause serious physical injury or death." Further, while some "objects are designed for peaceful purposes," they "may be used as dangerous weapons. The way an object is used or intended to be used in an assault determines whether or not it is a dangerous weapon." M Crim JI 17.10.

Defendant argues that there was insufficient evidence to support his felonious assault conviction because a "table" knife does not constitute a dangerous weapon. Whether an instrumentality that was used in an assault constitutes a "dangerous weapon" is a question of fact for the jury. See *People v McCadney*, 111 Mich App 545, 550; 315 NW2d 175 (1981). The jury was instructed in accordance with M Crim JI 17.10, and we see no basis to reverse its factual determination that the knife in defendant's hand was a dangerous weapon under the circumstances. See *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008) ("This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses."). The jury had an opportunity to examine the knife because it was admitted into evidence. Although a "dinner" or "table" knife (as it was variously referred to at trial) is not designed to be dangerous, it can become a dangerous weapon if used for the purpose of an assault. Here, Bartman testified that defendant drew the knife in response to Bartman's advance and thus a reasonable jury could conclude that defendant intended to use the knife as a dangerous weapon.

Defendant relies on inapposite caselaw. In *People v Stevens*, 409 Mich 564, 565-567; 297 NW2d 120 (1980), the Supreme Court held that a "totally inoperable" starter pistol does not constitute a dangerous weapon under the felonious assault statute because that instrument did not fit within any of the categories of weapons provided in MCL 750.82(1). In contrast, a knife is explicitly included in the statute's definition of a dangerous weapon, MCL 750.82(1), and there is no requirement that the knife bear certain characteristics. Defendant's reliance on *People v Vaines*, 310 Mich 500, 506; 17 NW2d 729 (1945) is also misplaced. In that case, the Supreme Court held that an "ordinary jackknife" did not constitute a "dangerous weapon" under the concealed weapons statute, now codified at MCL 750.227, when there was no evidence that the defendant used or carried the knife for the purpose of using it as a weapon. *Id*. Setting aside that defendant was not convicted of carrying a concealed weapon, in this case there was evidence that

defendant intended to use the knife as a weapon because he drew it in response to Bartman's advance. For those reasons, there was sufficient evidence to support defendant's felonious assault conviction.

## C. RESISTING OR OBSTRUCTING A POLICE OFFICER

To establish criminal liability under MCL 750.81d, the prosecution must prove that that "(1) the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer, and (2) the defendant knew or had reason to know that the person that the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties." *People v Corr*, 287 Mich App 499, 503; 788 NW2d 860 (2010). " 'Obstruct' includes . . . a knowing failure to comply with a lawful command." MCL 750.81d(7)(a). The prosecution must also "establish that the officers' actions were lawful as an element of resisting or obstructing a police officer under MCL 750.81d." *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014) (quotation marks and citation omitted).

Sergeant Crawford testified that he was searching for the suspect when he saw defendant 20 to 30 yards away in a "wooded area along a creek"; defendant matched the suspect's description. Crawford identified himself as a police officer and ordered defendant to stop. Crawford said that defendant "took off running," but later clarified that defendant was already running when the command was made. Crawford and the other officers did not have a bullhorn or any other way to amplify their voice, but Crawford testified that he yelled his command for defendant to stop. When defense counsel asked whether defendant did anything to indicate that he heard the officers tell him to stop, Crawford responded that he "[c]ontinued to run after he knew we were there."

This testimony was sufficient to allow a rational trier of fact to conclude that the elements of resisting or obstructing arrest were met. Defendant knew or had reason to know that Sergeant Crawford was a police officer because he identified himself as such. According to Crawford, defendant continued to run after he knew the police were there, thereby obstructing the police by failing to comply with a lawful command. Defendant claims that he did not obstruct Crawford because he did not hear his order to stop. However, Crawford testified that he heard defendant making noise as he walked through the brush from approximately 40 to 60 feet away. And if Crawford could hear defendant walking through the brush, then a reasonable jury could infer that defendant would have been able to heard Crawford's command. Further, Crawford testified that defendant was not continuously running and at one point was "hunkered down," which indicates that defendant only began to run once he became aware of the officer's presence. Finally, "seizures are reasonable for purposes of the Fourth Amendment . . . if based on probable cause." *People v Lewis*, 251 Mich App 58, 69; 649 NW2d 792 (2002). When Sergeant Crawford saw defendant, he knew defendant was accused of violating a PPO, stalking, and assault. Accordingly, he had probable cause to order defendant to stop and to arrest him.

## IV. JURY INSTRUCTIONS

Defendant also argues that the trial court improperly instructed the jury on the elements of resisting and obstructing a police officer. Because defendant did not raise his challenge to the jury instructions before the trial court, our review is for plain error. *People v Carines*, 460 Mich

750, 752-753; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories that are supported by the evidence." *People v Crawford*, 232 Mich App 608, 620; 591 NW2d 669 (1998). "Even if somewhat imperfect, instructions do not warrant reversal if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

As noted, the prosecution was required to prove that the officers acted lawfully as an element of resisting or obstructing arrest. *Quinn*, 305 Mich App at 491. This requirement is found in M Crim JI 13.1, which provides in part that prosecution must prove that the officer "gave the defendant a lawful command, was making a lawful arrest, or was otherwise performing a lawful act." In this case, the trial court failed to instruct the jury that the officer's actions must have been lawful. However, defendant fails to explain how he was prejudiced by this error. As discussed above, the officers had probable cause to arrest defendant, and defendant does not argue otherwise. Thus, while defendant is correct that the trial court should have instructed the jury on all elements of the offense, he has not shown that this error affected the outcome at trial.

## V. *BRADY* VIOLATION

Finally, defendant argues that the prosecution and the investigating officers violated his due process right to discovery. We disagree.

A defendant does not have a constitutional right to discovery, but "due process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the evidence." *People v Jackson*, 292 Mich App 583, 590; 808 NW2d 541 (2011). In *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

On April 22, 2016, defendant filed a motion to dismiss the felonious assault charge because of an alleged discovery violation. In his motion, defendant asserted that the prosecution had recently found and provided the fingerprint analysis of the knife found in Monroe's driveway, but had informed defendant that the results of DNA testing would not be completed by trial. Before the trial began on April 27, 2016, the trial court stated that it would reserve ruling on defendant's motion and instructed both parties not to reference DNA testing in their opening

statements. The prosecution and defendant stipulated to the admission of the fingerprint report, which was inconclusive.

At trial, Deputy Eric Thompson of the Clinton County Sheriff's Office testified that he did not submit for testing DNA swabs taken of the knife and a hat[5] found in Monroe's driveway. Thompson explained that DNA testing was unnecessary because Bartman saw defendant with the knife and a photograph recovered from defendant's camera showed defendant wearing the hat. After the first day of trial, the trial court denied defendant's motion, reasoning that the DNA evidence was irrelevant.

Defendant's alleged *Brady* violation fails all three prongs. The prosecution was not suppressing evidence. Rather, the DNA tests results simply did not exist. And the prosecution was not required "to seek and find exculpatory evidence or assist in building or supporting a defendant's case . . . ." *People v Bosca*, 310 Mich App 1, 30; 871 NW2d 307 (2015) (quotation marks and citation omitted). Next, defendant cannot establish that the DNA testing would have been favorable to his defense. The photograph of him wearing the hat suggests that the DNA swab would have matched defendant's sample. And even if the DNA swab of the knife would have been inconclusive, this evidence would not have been material given that Bartman identified defendant as the perpetrator of the assault and defendant was found in the surrounding area shortly after the incident. Indeed, the inconclusive fingerprint analysis did not affect the outcome at trial.

Affirmed.

/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro
/s/ Michael J. Riordan

---

[5] Bartman testified that he knocked a hat off defendant's head when he took a swing at him.